Filed 9/30/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re MICHAEL S., a Person Coming Under the Juvenile Court Law. | B269598 (Los Angeles County Super. Ct. No. DK13928) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MIGUEL S., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Veronica McBeth, Judge. (Retired judge of the L.A. Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed.

Michelle Ben-Hur, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Jessica Paulson-Duffy, Deputy County Counsel, for Plaintiff and Respondent.

Miguel S. (Father) appeals from the juvenile court's order removing his son, Michael, from his custody. At the time the juvenile proceedings began, Michael lived with his mother, Maria O. (Mother), and Father. Father now lives elsewhere and is prohibited by a restraining order from any contact with Michael other than in supervised visits.

Father does not challenge the juvenile court's jurisdictional findings and does not argue for any practical change in his access to Michael. Rather, Father argues that the governing statute, Welfare and Institutions Code section 361, subdivision (c)(1), does not permit removal from just one "custodial" parent.[1] Because the court ordered Michael to remain in Mother's custody with restrictions on Father's contacts, Father claims that there was necessarily a reasonable alternative to removal and that the removal order therefore exceeded the juvenile court's jurisdiction.

We disagree with Father's statutory interpretation and therefore affirm.

**BACKGROUND**

Michael was born in 2011 and was four years old at the time of the juvenile court proceedings. He lived with Mother and Father and three children from Mother's previous marriage to Nicolas P. (Nicolas).

On October 16, 2015, the Los Angeles County Department of Children and Family Services (Department) received a referral from the child abuse hotline concerning possible sexual abuse of Michael's older half sister, M.P. Social workers and the police went to the family's home that day to investigate. When interviewed, M.P. (who was 15 years old at the time) admitted that Father had touched her inappropriately on a number of occasions. The most recent inappropriate touching had occurred just a few days earlier when Mother was in the hospital.

When questioned, Mother admitted that she was in the hospital because Father had pushed her into the bathtub while they were having an argument. She fell backward and

---

[1] Subsequent undesignated statutory references are to the Welfare and Institutions Code.

2

hit the faucet. She suffered broken ribs and a broken vertebrae. Mother also disclosed a previous incident in which Father had thrown a lamp in her face. M.P. and her sister separately told a social worker that Father had thrown a metal tool at Mother about four to six months previously.

Following the interviews, Nicolas picked up Michael's three half siblings to stay with him. Mother and Michael left their apartment to stay in an emergency shelter. When Father learned from Mother that law enforcement officers were at the apartment speaking with M.P., he refused to return home. The police officers gave Mother an emergency protective order against Father that was effective for seven days.

The Department filed a petition concerning the four children on October 21, 2015. An initial detention hearing occurred the same day. The juvenile court released Michael to Mother and released the other three children to Mother and to their father, Nicolas. The court also extended the temporary restraining order against Father until November 9, 2015. On November 9, the court again extended the restraining order until November 18, 2015, the date set for the adjudication hearing, because Mother had been unable to serve Father.

The Department's jurisdiction/disposition report filed before the November 18 hearing stated that Michael's three half siblings continued to live with Nicolas, and Michael and Mother lived at a friend's house at an undisclosed address. The Department had not been able to interview Father, and he had not arranged any supervised visits with Michael. Mother had expressed interest in moving back to their original residence, and the Department was "exploring the possibility of mother doing so once it is verified that all of [Father's] belongings are out of the home and the locks have been changed." Mother had recanted her statements about domestic violence, but she told the Department that she had no intention of resuming a relationship with Father. The Department observed that Mother's prior statements were very detailed and concluded that it was "likely that [Mother] is now recanting the domestic violence out of fear due to [Father's] gang ties as previously reported by [Mother]."

3

The Department's jurisdiction/disposition report recommended various findings for the court, including that "[c]ontinuance in the home of [Father] would be contrary to the child's welfare." The Department also recommended that the court find that "[c]lear and convincing evidence shows that the child Michael should be removed from the physical custody of [Father] in that there is a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child or would be if the child was returned home, and there are no reasonable means by which the child's physical health can be protected without removing the child from the physical custody of the child's father."

The Department's jurisdiction/disposition report attached the Department's prior detention report filed before the October 21, 2015 detention hearing, which included a section on "reasonable efforts." That section summarized the steps the Department took to "prevent or eliminate the need for the child(ren)'s removal from the home" prior to the detention hearing. Those steps consisted of the Department's interviews of the children and parents, unsuccessful attempts to contact Father, investigation of the parents' criminal histories, placement of Mother and Michael in an emergency shelter, and obtaining an emergency protective order. The detention report also recommended a permanent restraining order.

Father made his first appearance at the November 18 hearing and provided an address in Apple Valley.[2] The court continued the jurisdiction/disposition hearing to December 15, 2015.

M.P. testified at the jurisdiction/disposition hearing on December 15, 2015, and confirmed that Father had touched her inappropriately in a sexual manner on multiple occasions. With respect to the alleged domestic violence, she testified that Mother had told her at the first juvenile court appearance that Father had "pushed her into the tub. And because of that, she had her—she hurt her spine." She also testified that she had

---

[2] M.P. had previously told the social worker and police officers about an incident that occurred when Mother and the children were spending the night in Father's Apple Valley home.

seen Father throw a tool at Mother about three months earlier. The tool was "like a wrench." It appeared to her that Father "wanted to purposely hit my mom with the tool, but my mom got to close the door on time."

At the conclusion of the hearing, the juvenile court stated that Michael would be "removed from his father." Father's counsel asked to be heard on that issue and requested "either that Michael not be removed from his care or we're asking for unmonitored visits." The court denied the request.

Following the hearing, the juvenile court ordered Michael removed from Father's custody. The court found that "[s]ubstantial danger exists to the physical or emotional health of minor(s) and there is no reasonable means to protect the minors without removal." The court also found that "[r]easonable efforts have been made to prevent or eliminate need for minor's removal from home." The court did not state the basis for that determination.

The court issued a permanent restraining order against Father that precludes him from any contact with Mother or Michael (or Mother's other children) except for scheduled supervised visits with Michael. The restraining order also states that Father "must move immediately" from the family's prior home. The restraining order expires on December 15, 2018.

## DISCUSSION

Father's statutory interpretation argument is an issue of law that we review independently. (*In re Marquis H.* (2013) 212 Cal.App.4th 718, 725.) Our objective is to ascertain legislative intent, based in the first instance on the statutory language itself. (*Ibid.*) However, we also keep in mind the context of the particular statute within the statutory scheme as a whole. "Given the complexity of the statutory scheme governing dependency, a single provision 'cannot properly be understood except in the context of the entire dependency process of which it is a part.' " (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1235.)

5

## 1.    The Governing Statutes

Section 361, subdivision (a)(1) provides that, when a minor is adjudged a dependent of the court, the court "may limit the control to be exercised over the dependent child by any parent or guardian." However, a child may not be removed from the physical custody of his or her parents unless there is "clear and convincing evidence" of one of the circumstances specifically enumerated in the statute. (§ 361, subd. (c).)

The circumstance that the juvenile court found here is that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c)(1).) Subdivision (c)(1) specifically identifies two alternatives for the juvenile court to consider as "a reasonable means to protect the minor." One is "[t]he option of removing an offending parent or guardian from the home." (§ 361, subd. (c)(1)(A).) The other is "[a]llowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." (§ 361, subd. (c)(1)(B).)

Father argues that the juvenile court's order removing Michael from his custody was not authorized by section 361, subdivision (c), and that leaving Michael in Mother's custody was, as a matter of law, an *alternative* to Michael's removal from Father. Thus, Father claims that the juvenile court could not both order Father to stay away from Michael and also order Michael removed from Father's custody.

We disagree that the juvenile court was precluded as a matter of law from considering the alternative of removal in this situation. By its language, section 361 appears to contemplate removal from one parent only. While that section is somewhat inconsistent in its use of the singular and plural, it does refer in places to the possibility of removal from only one parent. For example, subdivision (c)(1) uses the singular possessive in stating that the court must determine that there are no reasonable means to protect the minor "without removing the minor from the minor's *parent's* or *guardian's*

6

physical custody." (§ 361, subd. (c)(1), italics added.) That same subdivision states that a prior adjudication that the minor is a dependent child of the court pursuant to section 300, subdivision (e) "shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the *parent* or *guardian* with whom the minor resided at the time of injury." (§ 361, subd. (c)(1), italics added.) Other subdivisions also use the singular in describing conduct that would warrant removal from the "parent." (See § 361, subd. (c)(2)–(5).)

Section 361, subdivision (c)(1)(A) clearly requires the court to consider the "option" of removing an offending parent from the home as a possible alternative to removal of the child from the parent. However, that subdivision does not state that the option of removing a parent from the home will *necessarily* be sufficient to protect the child in all cases even if ordered. It does not, by its terms, preclude the possibility of ordering both removal of the parent from the home and removal of the child from the parent.

Flexibility in ordering removal from only one custodial parent makes sense in light of the many different custody arrangements that a juvenile court might need to address. For example, two parents might live apart and share custody of a child. Or the parents might live together with a child most of the time, but one of the parents maintains a separate residence that the child sometimes visits. In such situations, if only one parent engages in the conduct underlying a dependency petition, the juvenile court might conclude that it is appropriate to remove the child only from the offending parent and allow the child to remain in the other parent's custody.

Indeed, the facts here illustrate the different living arrangements that a juvenile court can confront. While Mother and Father lived with Michael in an apartment in Los Angeles at the time the relevant events occurred, they were not married and Father apparently had a separate residence in Apple Valley that the children had previously visited. Father left his family, initially on his own volition, after learning that law enforcement and social workers had made a visit. By the time the initial petition was filed, he was no longer at the home. While the juvenile court ordered Father to stay away

7

from the family's residence and from the children, under the circumstances the juvenile court could also reasonably consider the option of removing Michael from Father's custody to confirm that, absent a further court order, Father was not permitted physical custody of Michael at any location.[3]

In other cases, dependency courts have removed a child from only one parent's custody when the parents did not live together.  (See *In re D.G.* (2012) 208 Cal.App.4th 1562 (*D.G.*) [removing child from the custody of the father who was also ordered out of the home]; *In re E.B.* (2010) 184 Cal.App.4th 568, 574, 578 [removing children from the father's custody based upon sexual and other abuse and allowing them to remain with the mother]; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1209–1210, 1217 [child removed from divorced father's custody and placed with the mother who shared legal custody].)

In *D.G.*, *supra*, 208 Cal.App.4th 1562, this court approved an order removing an offending father from the home and also removing the father's children from his custody under section 361 (albeit without addressing the statutory argument that Father makes here).  The juvenile court in that case had ordered the father removed from the home because of the father's sexual abuse of D.G. while the children remained in the mother's custody.  After reviewing the requirements of section 361, subdivision (c), this court found substantial evidence to support the juvenile court's findings that "allowing Father to remain in the family home posed a substantial danger to the health and safety of [the children] and there were no reasonable means of protecting the children without removal from Father's custody."  (*Id.* at p. 1574.)

The cases on which Father relies do not hold that a child may never be removed from only one custodial parent.  Rather, those cases held that the statutory scheme does not permit removing a child from a parent and then immediately returning that child to the *same* parent.  (See *In re Damonte A.* (1997) 57 Cal.App.4th 894; *In re Andres G.* (1998) 64 Cal.App.4th 476; *In re N.S.* (2002) 97 Cal.App.4th 167.)  That is not what

---

[3] Although the juvenile court did not identify this as a reason for ordering removal, we note that the restraining order expired after three years.

occurred here.  The juvenile court did not order Michael removed from Mother, and therefore did not create the "unseemly inconsistency" of a finding that it was necessary to remove a child from a parent to protect the child while simultaneously returning the child to the same parent.  (*Andres G.*, at p. 481.)

Father also argues that section 361.2 supports the conclusion that the statutory scheme does not permit removing a child from one custodial parent only.  Section 361.2, subdivision (e) specifies the procedure for placement of a child who has been removed pursuant to section 361.  Once a child has been ordered removed, "the court shall order the care, custody, control, and conduct of the child to be under the supervision of the social worker."  The social worker's first option for placement is with another parent "with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300."  (§ 361.2, subd. (a); *id.*, subd. (e).)  Other options include a "relative," a "nonrelative extended family member," a "resource family," a foster home, community care facility, or a group home.  (§ 361.2, subd. (e)(1)–(11).)  The listed alternatives do not include placement with a parent with whom the child was living at the time the relevant events occurred.  Father argues that this is because the Legislature contemplated that leaving a child with a custodial parent while placing limits on the other custodial parent would be an alternative to removal under section 361.

While this argument has some force, we do not believe that section 361.2 should be read to preclude removal from only one custodial parent in all situations.  The section addresses placement when a child is removed from his or her previous home.  Such placement is necessary only when the child has no home in which to stay.  If a child remains with a custodial parent, there would be no need to consider other placement options.  Although section 361.2 does not expressly identify the possibility of keeping a child in one custodial parent's home and removing custody from the other parent, we do not read it to foreclose that possibility as a matter of law, particularly in light of the different living situations that a juvenile court might confront.

9

**2.    The Juvenile Court's Order**

The juvenile court ordered Michael removed from Father's custody with a finding that "substantial danger exists to the physical or emotional health" of Michael and there was "no reasonable means to protect" Michael without removal.  The court did not state the facts on which this conclusion was based.  (See § 361, subd. (c)(1).)  However, on appeal Father does not challenge the sufficiency of the evidence underlying the court's removal order, but argues only that the court was precluded from considering the option of removal as a matter of law.  Because we reject that legal argument, we affirm.

### DISPOSITION

The juvenile court's order removing Michael from Father's physical custody is affirmed.

CERTIFIED FOR PUBLICATION.


                                                        LUI, J.

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.